**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **JOSHUA ANDREWS,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| **v.** | § | |
| | § | **CIVIL A. NO.**  4:23-cv-4434 |
| **MONTGOMERY COUNTY** | § | |
| **HOSPITAL DISTRICT AND** | § | |
| **SPENCER HALL (individually),** | § | |
| | § | |
| Defendants. | § | |

---

## PLAINTIFF JOSHUA ANDREW'S ORIGINAL COMPLAINT AND JURY DEMAND

---

TO THE HONORABLE DISTRICT COURT JUDGE:

Plaintiff Joshua Andrews ("Plaintiff") files this Original Complaint and Jury Demand against Defendants, Montgomery County Hospital District ("MCHD") and Spencer Hall ("Mr. Hall).

Defendant Mr. Hall fired Mr. Andrews in retaliation for his use of FMLA, when his condition resulted in a need for medical leave. However, this was not an isolated event. In the years prior to his termination, MCHD established a pattern of stigmatizing and discriminating against Mr. Andrews because of his disability.

A jury will find that Defendants fired Mr. Andrews because of his disability, need of reasonable accommodations, and use of federally protected leave. In support, Plaintiff shows the following:

# I.     PARTIES, JURISDICTION, AND VENUE

1.     Plaintiff Joshua Andrews is an individual who resides in Montgomery County, Texas.

2.     Defendant Montgomery County Hospital District is a political subdivision of the State of Texas. Defendant operates an office located at 1400 South Loop 336 West, Conroe, TX 77385. Defendant may be served through its MCHD may be served with process by serving its CEO, Randy E. Johnson at 1400 South Loop 336 West, Conroe, TX 77304.

3.     Defendant Spencer Hall is an individual that may be served at his place of work, which is 1400 S. Loop 336 West, Conroe, TX 77304 or at his place of residence.

4.     Defendant MCHD is an employer within the meaning of the Americans with Disabilities Act Amendments Act.

5.     Defendant Mr. Hall is an employer within the meaning of the Family and Medical Leave Act.

6.     This Court has jurisdiction to hear the merits of the claims under 28 U.S.C. § 1331.

7.     Venue is proper in the district and division under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in within the District.

# II.     FACTUAL BACKGROUND

**Joshua Andrews began working for Montgomery County Hospital District in 2017 as a paramedic.**

8.     Mr. Andrews always gave his best efforts to his job but faced discrimination because of his disabilities.

9.     Mr. Andrews suffers from depression and ADHD. Additionally, he suffers from gastrointestinal problems with symptoms that resemble ulcerative colitis and Crohn's disease. These problems cause severe cramping and other severe symptoms.

10.     Mr. Andrews' medical conditions require him to take medications and he occasionally needs accommodations in the form of leave.

**When MCHD learned of Mr. Andrews' disabilities and medications, they began targeting and stigmatizing him.**

11.     In or around 2019, Mr. Andrews' coworker, Bryan Perry, began making comments about the medications Mr. Andrews took. Mr. Perry started a rumor that Mr. Andrews was abusing narcotics at work.

12.     In 2020, Mr. Andrews was partnered with Megan Bullinger, who was pregnant at the time. COVID-19 was in its prime, so Mr. Andrews took every COVID-19 call, as well as any psychiatric or law enforcement related calls, for the safety of his partner during her pregnancy. This was about 70%-90% of the calls and Mr. Andrews was often staying late after shifts to complete all of the reports.

13.     On August 4, 2020, Mr. Andres and Ms. Bullinger responded to a motor vehicle accident with entrapment. The patient was critical and required full attention. During the call, Ms. Bullinger did not know her medication dosages and refused to use a phone application that would provide the appropriate dosages.

14.     After the patient was extracted, they began transporting. During transport, Mr. Andrews performed a full assessment of the patient, established an IV, and started the administration of TXA.[1] Ms. Bullinger was focusing on documentation rather than providing patient care.

15.     When they arrived at the hospital care, Mr. Andrews gave a report to the physician. Ms. Bullinger was supposed to be overseeing the transfer of the patient from the ambulance

---

[1] Tranexamic Acid

stretcher to the hospital bed. However, Ms. Bullinger neglected her duties and left the task of transfer to the firefighters, who are not trained in such procedures.

16. While the firefighters were doing the transfer, the patient slipped, the IV was lost, and the TXA was not administered. The patient died shortly after.

17. When Mr. Andrews saw what happened, he instructed Ms. Bullinger to put the computer down and assist, like she was supposed to be doing. Ms. Bullinger was offended by this and told him that he should not tell her what to do in front of others because it was humiliating for her and makes her look bad.

18. Paramedic training specifically dictates that when there is an issue involving patient care, and particularly an error that is ongoing and could affect the patient outcome, they are required to speak up immediately to fix the issue. Patient care is always paramount.

19. Mr. Andrews calmly and straightforwardly told Ms. Bullinger that he was disappointed that she was more concerned with how she was perceived by others than she was about the fact that a young man had just died because of completely preventable circumstances.

20. Ms. Bullinger began to cry and asked Supervisor Carrie King if she could go home because Mr. Andrews was "being mean."

21. Ms. Bullinger was permitted to go home on administrative leave and her absence was not counted against her.

22. Mr. Andrews and Ms. Bullinger texted in the 24 hours between that shift and the next. Ms. Bullinger expressed that she saw where Mr. Andrews was coming from and that she might have been overly emotional.

23. Mr. Andrews went into the next shift under the impression that the incident was behind them. Unfortunately, that was not the case.

24.    It was common practice between Ms. Bullinger and Mr. Andrews for her to give him her debit card to take to the gas station to pick up some items for her. Because she was pregnant, her feet were very swollen, and it was uncomfortable for her to get in and out of the ambulance.

25.    During the previous shift, Mr. Andrews had taken Mr. Bullinger's debit card to the gas station, per usual. They received a call right after and the card became misplaced during the response.

26.    The next day, Ms. Bullinger told Mr. Andrews that she was looking for her card. Later, he found it on the floor of the ambulance bay, and he brought it to her.

27.    Ms. Bullinger accused Mr. Andrews of stealing her card and holding it temporarily. She stated that the believed Mr. Andrews had the card all along and that he was waiting for her to cancel the card as punishment for her mistakes in the shift before.

28.    A coworker, Nikki Buchanan, interrupted and began supporting Ms. Bullinger's accusations, without any proof or reason. She called Mr. Andrews a "psycho."

29.    Ms. Bullinger and Ms. Buchanan called the supervisor at the time, Chief Kevin Mifflin. He came to the station and interviewed Ms. Bullinger first, then Mr. Andrews.

30.    During the interview, Chief Mifflin asked Mr. Andrews what medications he was taking. When Mr. Andrews responded that he was not comfortable answering that question, Chief Mifflin said that Mr. Andrews needed to stop being dishonest because he already knew his medications and "history."

31.    Chief Mifflin informed Mr. Andrews that he knew that he was taking Wellbutrin and that he knew of Mr. Andrews' history of receiving ketamine therapy.

32. Chief Mifflin informed Mr. Andrews that he had conducted personal research on these medications, and that the side effects could be anger and irritability.

33. Chief Mifflin is not a doctor.

34. Chief Mifflin told Mr. Andrews that if he valued his job, he would tell him everything.

35. Feeling threatened, Mr. Andrews told Chief Mifflin that he had recently been feeling more depressed, but that he attributed that to his increased workload, working under stressful conditions, and the constant pressure to perform despite the organization being grossly understaffed.

36. Chief Mifflin also made comments about Mr. Andrews' appearance. He commented that Mr. Andrews has a "weird stance" that might make some people uncomfortable. He went on to say that he believed based on Mr. Andrews' posture, that he was an angry individual and that the medication he was prescribed supported this opinion.

37. Mr. Andrews asked if he could go home. He was permitted to leave, but his absence was counted against him. In contrast, Ms. Bullinger was placed on administrative leave.

38. The following shift, Mr. Andrews was sent to headquarters, accompanied by Chief Mifflin, for a meeting with human resources.

39. Mr. Andrews was informed that he was being placed on a PIP and that the paperwork had already been completed before anyone spoke to him about it.

40. Chief Mifflin and HR used Bryan Perry's rumors and the incident with Ms. Bullinger to establish a "pattern of behavior."

41. The PIP was to last for 12 months. During this time, Mr. Andrews could be fired for any reason.

42. During the meeting, Mr. Andrews was asked about his mental health and the medications he was on. He was told that he needed to change his treatment because it was "obviously not working."

43. Mr. Andrews expressed his concerns to HR and Chief Shaw that he was very uncomfortable about the circumstances of this incident, particularly that no one interviewed him prior to making the decision to place him on a PIP.

44. Mr. Andrews expressed that their decision to place him on a PIP seemed to be based solely upon his medical history and a stigmatization of his disability, and not upon the details of the incident.

**Instead of addressing Mr. Andrews' concerns and complaints that his disability was being used against him and taking corrective action, MCHD retaliated by undertaking a pattern of targeted discriminatory action against Mr. Andrews.**

45. The PIP required regular check-ins with Chief Mifflin in which Mr. Andrews had to discuss his medical history, his medications, and provide proof that he was "working on himself."

46. Chief Mifflin is not a doctor, nor is he a licensed therapist.

47. No documentation of the meetings was ever provided to Mr. Andrews when Chief Mifflin was conducting them.

48. Later, Chief Spencer Hall became Mr. Andrews' supervisor. He documented each meeting.

49. Mr. Andrews asked Emily Fitzgerald for any and all of Chief Mifflin's documentation regarding the PIP. His request was ignored, and no documentation was ever provided.

50. After receiving the PIP, Mr. Andrews was assigned a new partner, Zack Coleman. At the time, Mr. Coleman was an intermediate EMT, meaning that he could not take calls involving advanced life support.

51. The majority of their calls involved advanced life support. So, Mr. Andrews had to take the majority of the calls.

52. On their first day working together, Mr. Coleman informed Mr. Andrews that he knew he was on medications and that he suffered from depression. He also stated that he heard Mr. Andrews had anger issues as a result of his medications.

53. Mr. Andrews did not provide Mr. Coleman with this information. Clearly, MCHD personal were repeatedly sharing Mr. Andrews medical history with colleagues who had no reason to know about his disability.

54. On September 13, 2020, they were transporting a stroke patient when Mr. Coleman attempted to counter flow over a median while driving at a high rate of speed. Mr. Andrews was injured and placed on Worker's Compensation shortly after.

55. Chief Mifflin took Mr. Andrews to be drug tested before taking him to the hospital, despite the fact that Mr. Andrews was injured and needed medical attention.

56. Despite Mr. Coleman also being on the call and the driver causing the injury, Chief Mifflin did not instruct him to take a drug test. Mr. Coleman took one of his own accord because he was the driver.

57. On the way to the drug test, Chief Mifflin asked Mr. Andrews if he would test positively for anything, to which Mr. Andrews responded no, and he tested negative.

58. Mr. Andrews usually tested positive, because he was prescribed Adderall for his disability. He stopped taking his prescribed medications after being placed on the PIP because of the threats and implications made by HR and the command staff present during the PIP meeting.

59. Because of the negative stereotypes about his medications and disabilities his coworkers and supervisors clearly held, Mr. Andrews felt that the only way to avoid discrimination and to show that he was "working on himself" was to stop taking his prescribed medications and test negative.

60. On the day of his first shift after Mr. Andrews was cleared to return to work from Worker's Compensation leave, he was informed that he was being placed on administrative leave.

61. Mr. Andrews was called in to meet with HR. During the meeting, Emily Fitzgerald, Jacob Shaw, and Chief Campbell informed him that he was being placed on administrative leave out of concern for his mental health.

62. According to HR, while Chief Mifflin worked with Mr. Coleman during Mr. Andrews' absence, Mr. Coleman stated that Mr. Andrews made a suicidal comment over a month prior.

63. The comment was nothing more than a joke made between coworkers.

64. HR also stated that Mr. Coleman described to Chief Mifflin that Mr. Andrews had a tendency to get annoyed and easily angered.

65. The instances of such behavior that were referenced were vague, inconsistent, and the timeframe did not correlate with any of their shifts or the responses during those shifts. In fact, Mr. Andrews had no recollection of any of the alleged examples.

66. Mr. Andrews expressed again that he was concerned with these complaints and the lack of investigation and communication with him. He also informed them that Mr. Coleman had knowledge of the PIP and his medication, as well as his history of depression and alleged "anger issues," even though Mr. Andrews had never disclosed any of that information to him.

67. His concerns were again completely ignored. Instead, he was told that he was still on a PIP and needed to be careful about how others perceive him. Further, he was told that it did not appear that he was abiding by the conditions of the PIP, despite his complete compliance.

68. Jacob Shaw commented that "there is a reason people get reputations around here" and that Mr. Andrews needed to have more situational awareness in regard to taking his medications. He also told Mr. Andrews that he needed to make more of an effort to conceal his use of medications or avoid taking them while he is on shift.

69. Emily Fitzgerald told Mr. Andrews that he should start using the employee assistance program more and perhaps that would help with his mental illnesses and performance problems at work. Mr. Andrews responded that the EAP only works if he is allowed to take his prescribed medications without repercussions.

70. Ms. Fitzgerald sent Mr. Andrews and email a few days later referencing that statement, but only that Mr. Andrews did not find EAPs useful. She omitted the more pertinent portion of the statement regarding being able to take his prescribed medication without repercussion.

71. In the following months, Mr. Andrews was assigned to work with Herbert Corlew.

72. Mr. Corlew stated to Mr. Andrews that he had heard several coworkers mention the PIP, his history of mental illness, and the alleged irritability/anger issues.

73. Mr. Corlew stated on several occasions that he did not understand why Chief Mifflin seemed to dislike Mr. Andrews.

74. Over the next few months, Mr. Andrews was increasingly written up for infractions that were unfounded and/or seemed personal in nature.

75. For example, Chief Mifflin wrote Mr. Andrews up several times for staying late to complete his reports. There is a policy at MCHD that all reports must be completed prior

to the employee leaving shift. Further, the policy states that if an employee is unable to complete a report prior to leaving shift, then a supervisor must give approval and a form should be submitted prior to the employee going home.

76.     Mr. Andrews was clearly not in breach of policy.

77.     Chief Mifflin threatened him, informing Mr. Andrews that it would not be a good idea for him to file a grievance contesting these write-ups because Mr. Andrews was already on a PIP, and it would not look good for Mr. Andrews.

78.     In December 2020, Mr. Andrews and Mr. Corlew were suddenly placed out of service and on administrative leave.

79.     Mr. Andrews and Mr. Corlew were drug teste because they had wasted fentanyl twice in the last month without administering it. These types of narcotics wastes are fairly common, but because it was fentanyl and Mr. Andrews was involved, the partners were removed from their shifts pending drug testing.

80.     Again, the drug test was negative for everything because Mr. Andrews was still abstaining from taking his prescribed medication.

81.     The drug tests and write-ups continued into 2021.

82.     On September 26, 2021, there was a truck inspection following downtime on a particularly busy day.

83.     At the time, Mr. Andrews' partner was Christopher Wright.

84.     After several emergency calls that morning, Mr. Andrews and Mr. Wright were cleaning and restocking the ambulance. Due to the volume of calls they had that morning, they had not been back to the station to restock in some time.

85.     Mr. Andrews went to the supply closet and as he was carrying supplies back to the ambulance, Chief Hall and his trainee, Ashley Fillmore, arrived at the station.

86.     Chief Hall instructed Ms. Fillmore to conduct a truck inspection. Both Chief Hall and Ms. Fillmore observed that Mr. Andrews was in the process of cleaning and restocking the ambulance at the time.

87.     Chief Hall was very hostile toward Mr. Andrews during the inspection. He told Mr. Andrews that he was a failure of a paramedic, that he was a terrible employee, that he was "a fucking tragic waste of time," and that he was a bad example to his partner and all of his coworkers and station mates.

88.     Chief Hall continued to berate Mr. Andrews and ended his rant with, "You can mother fuck me behind my back all you want. I really don't think anyone will care."

89.     Part of the inspection was to produce your driver's license. Mr. Andrews had forgotten his wallet at home that morning, but had a picture of his license, as well as his passport, on his phone. He also had his driver's license number memorized.

90.     Chief Hall made Mr. Andrews and Mr. Wright drive to Mr. Andrews' apartment to retrieve his license. When Mr. Andrews found it, he called Chief Hall to inform him that they were ready to return back to service.

91.     Chief Hall accused Mr. Andrews of lying about finding his license and made Mr. Wright take and send a picture of Mr. Andrews holding the license, with a computer screen displaying the date and time in the background.

92.     Mr. Wright remarked that he felt like Chief Hall was being a bully and that this was not necessary.

93. That night, they received a cardiac arrest call. District supervisors are automatically assigned to cardiac arrest calls. Chief Hall and Ms. Fillmore arrived at the scene and began CPR and had ALS procedures in place before Mr. Andrews and Mr. Wright arrived.

94. Chief Hall and Ms. Fillmore informed Mr. Andrews and Mr. Wright that they would have to write the report and do the documentation, despite the fact that they performed all of the assessments/interventions.

95. Once again, Mr. Wright remarked that it seemed like Chief Hall had it out for Mr. Andrews.

96. Later, Mr, Andrews and Mr. Wright went by Station 10 to restock, which is the station Chief Hall and Ms. Fillmore were based out of. Mr. Andrews asked Mr. Wright to go in to complete the resupply, so he could complete the reports he was backed up on. Additionally, he did not feel like being harassed by Chief Hall anymore that day.

97. Mr. Wright was gone for a substantial amount of time. When he came back to the ambulance, he appeared upset and withdrawn. Mr. Wright remained uptight and seemed incredibly stressed for the remainder of the shift.

98. On October 1, 2021, the morning of Mr. Andrews' next shift, he arrived at work to find Chief Hall, Chief Fillmore, and Chief Goodrich waiting for him.

99. Mr. Andrews arrived one minute late to work because he had to pull over and throw up several times on his way in.

100. Mr. Andrews was immediately separated from his partner and taken to the living quarters of the station and interrogated by Chief Goodrich and Chief Hall. Chief Fillmore appeared uncomfortable and took notes quietly at a desk in the corner.

101. Mr. Andrews was informed that his partner made a remark about how Mr. Andrews had struck the interior door of the ambulance while on their way to the cardiac arrest call on September 26, 2021, because he could not find any large gloves.

102. Mr. Andrews was informed that his partner reported that Mr. Andrews had been very angry, that he made him uncomfortable, and that he had submitted a formal complaint against Mr. Andrews.

103. Chief Goodrich told Mr. Andrews that he needed to think very long and hard about his answers to his questions and answer as if Mr. Andrews' "job was on the fucking line."

104. Mr. Andrews upheld that he did not engage in any aggressive outbursts. In fact, Mr. Andrews' demeanor was defeated from how that shift went and he was just trying to make it through the day without being harassed any more than he had already been.

105. Chief Hall responded, "Well, with your history of mental health issues, the meds, along with the recent PIP… you can see why we would believe this about you."

106. Mr. Andrews was separated from his partner for the remainder of the day.

107. On October 3, 2021, Mr. Andrews was reunited with his partner, Mr. Wright.

108. Mr. Wright was visibly upset and immediately apologized for the way Mr. Andrews was treated by Chief Goodrich and Chief Hall.

109. Mr. Wright stated that when he went to restock on September 26, 2021, Chief Hall began questioning him about Mr. Andrews' demeanor during that evening. Chief Hall asked if Mr. Andrews had done anything at all that suggested that he was irritated in any way.

110. Chief Hall told Mr. Wright to think very long and hard about any action on Mr. Andrews' account that might have appeared aggressive or implied that he was disgruntled about how he was treated during the inspection.

111. Mr. Wright stated that he felt like he could not get out of the conversation, and he felt pressured to describe a scenario he felt could express both of our frustrations toward how we had been treated that day, as well as give Chief Hall a satisfactory enough answer to leave him alone.

112. Mr. Wright stated that afterwards, he went to the supply closet and Chief Hall followed him. Chief Hall cornered him and instructed him to report Mr. Andrews.

113. Mr. Wright told Mr. Andrews that he felt that he had no choice but to make a report because Chief Hall strongly gave him the impression that he would face disciplinary action and possibly even termination if he did not do it.

114. Mr. Wright stated that he attempted to backtrack his previous statement, but Chief Hall told him that the details did not matter, he just needed something he could take to HR.

115. Chief Hall told Mr. Wright that he would help write the report and that Mr. Wright was not the send the email until Chief Hall had looked at it. Chief Hall instructed Mr. Wright to go to Station 10 after his shift and they would write the report together.

116. Chief Hall instructed Mr. Wright not to mention any of this to Mr. Andrews and implied that there would be consequences if he did.

117. Mr. Wright stated that he never intended for this to happen, but he felt like his job was at risk if he did not file a complaint.

**The culmination of MCHD's harassment and discriminatory behavior resulted in Mr. Andrews' termination, in retaliation for engaging in a protected activity.**

118. On October 5, 2021, Mr. Andrews was issued a Last Chance Agreement (LCA).

119. Mr. Andrews was brought into a meeting with Chief Hall, Chief Shaw, and Chief Welch, accompanied by Emily Fitzgerald from HR. "Operational issues" were cited as the reason for the LCA.

120. Mr. Andrews asked that Chief Hall leave the room. He informed the remaining personnel about Chief Hall fabricating a false report and coercing and bullying Mr. Wright into submitting it.

121. Mr. Andrews also explained that the reason he had been late was due to issues involving his disability, for which he was on FMLA at the time.

122. After the meeting, Mr. Andrews was asked to send in Mr. Wright to verify his account of events.

123. Mr. Wright informed them that Chief Hall had been harassing and bullying Mr. Andrews, as well as making comments about his disability, his FMLA status, and the PIP he had been placed on in 2020.

124. Once again, no investigation was undertaken prior to giving Mr. Andrews the LCA, despite Mr. Andrews numerous complaints and contradictory account of events.

125. Chief Shaw commented that he could not understand why Mr. Andrews was always in trouble and that it "seems like you rubbed someone the wrong way."

126. The LCA essentially stated that Mr. Andrews could be fired for any reason and that any mistake over the next 180 days would be more than enough to terminate Mr. Andrews' career with MCHD.

127. Due to the stress over the PIP and the LCA, Mr. Andrews' stomach issues became significantly worse in the following months. Knowing that he was on the brink of being

fired for any misstep made things exponentially more stressful and exacerbated his condition.

128. Mr. Andrews' worsened condition resulted in his need to use FMLA leave. MCHD clearly had a problem with Mr. Andrews' use of federally protected leave.

129. On November 2, 2021, Mr. Andrews was contacted by Chief of Professional Development, Michael Wells-Whitworth. He was contacting Mr. Andrews to ensure that his partner had signed a report from the previous shift.

130. When Mr. Andrews complained about this to Chief Hall, Hall stated that micro-management was necessary for employees like Mr. Andrews, who were "always calling off for FMLA."

131. Chief Hall stated that while it seemed like command staff were being hard on Mr. Andrews, these measures were necessary because he had no idea when Mr. Andrews would be calling off for his "FMLA crap."

132. On December 21, 2021, Mr. Andrews became ill on his way to work and called Chief Hall to inform him that he would not be able to make it to his shift that day. Mr. Andrews told Chief Hall to remove him from the schedule for his following shift of December 23, 2021.

133. Mr. Andrews told Chief Hall that he would check in on December 23, and let him know what his availability would be for the next shift.

134. Chief Hall updated the scheduling page about Mr. Andrews' absences, noting that Mr. Andrews was on FMLA. Additionally, Chief Hall left a comment emphasizing that Mr. Andrews had called in six minutes prior to the beginning of his shift.

135. On the morning of December 23, 2021, Mr. Andrews received a text from Chief Hall asking where he was and if he was okay. Mr. Andrews called Chief Hall and told him that he was still sick and that he would be off for FMLA for the remainder of the day.

136. Chief Hall told Mr. Andrews that he would be talking to HR and to wait for further instruction.

137. Around 11:00 AM, Mr. Andrews received a call from HR, informing him that they were terminating Mr. Andrews' employment and considering his absence on December 23, 2021, as a "no call, no show," despite the fact that Mr. Andrews told Chief Hall on December 21 and on December 23 that he would not be able to work that day due to his disability and would be using his approved, and protected, FMLA leave.

138. Defendants' actions violate the Americans with Disabilities Act Amendments Act and the Family and Medical Leave Act.

### III. CONDITIONS PRECEDENT

139. Plaintiff, Mr. Andrews, filed his Charge of Discrimination with the U.S. Equal Employment Opportunity Commission.

140. Plaintiff, Mr. Andrews, files this complaint within 90 days of receiving notice of his right to sue from the EEOC.

141. All conditions precedent to filing suit have been satisfied and fulfilled.

### IV. DISCRIMINATION IN VIOLATION OF THE ADAAA AGAINST MCHD

142. Plaintiff re-alleges and incorporates all the allegations contained in the above paragraphs as if fully stated herein.

---

143. Defendant's actions, including, but not limited to, its decision to terminate Mr. Andrews, the harassment, the failure to reasonably accommodate Mr. Andrews, and the later interference with his accommodations, were undertaken because of his disabilities. These actions constitute violates of the Americans with Disabilities Act of 1990, U.S.C. § 12111, *et seq.*, as amended ("ADAAA").

144. To redress the injuries sustained by Mr. Andrews on account of these discriminatory actions, he has retained the undersigned counsel to represent him in this action. He therefore seeks recovery of reasonable attorneys' fees, experts' fees, and costs.

145. Additionally, Mr. Andrews seeks any and all declaratory and injunctive relief allowable under the law for Defendant's unlawful discrimination.

## V.      RETALIATION IN VIOLATION OF THE ADAAA AGAINST MCHD

146. Plaintiff re-alleges and incorporates the allegations contained in the above paragraphs as if fully stated herein.

147. Defendant's actions as described herein constitute unlawful retaliation on the basis of Plaintiff's protected activities of seeking reasonable accommodations and complaining of discrimination. These actions constitute violations of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12111, *et seq.*, as amended ("ADAAA").

148. To redress the injuries sustained by Mr. Andrews on account of Defendant's retaliatory actions, he has retained the undersigned counsel to represent him in this action. He therefore seeks recovery of reasonable attorneys' fees, experts' fees, and costs.

149. Additionally, Mr. Andrews seeks any and all declaratory and injunctive relief allowable under the law for Defendant's unlawful discrimination.

## VI.  INTERFERENCE WITH RIGHTS IN VIOLATION OF
## THE FMLA AGAINST MR. HALL

150.  Plaintiff re-alleges and incorporates the allegations contained in the above paragraphs as if fully stated herein.

151.  Plaintiff was an eligible employee as defined by the FMLA 29 U.S.C. § 2611.

152.  Defendant's actions violating the FMLA include, but are not limited to, interference with Plaintiff's rights pursuant to the FMLA.

153.  Defendant discriminated or otherwise retaliated against Plaintiff in violation of the FMLA.

154.  Defendant's actions as described above constitute unlawful denial of and/or interference with Plaintiff's attempts to exercise his rights under the FMLA, in violation of 29 U.S.C. § 2615.

155.  To redress the injuries sustained by Mr. Andrews on account of Defendant's discriminatory actions, he has retained the undersigned counsel to represent her in this action. He therefore seeks recovery of reasonable attorneys' fees, experts' fees, and costs.

156.  Additionally, Mr. Andrews seeks any and all equitable and injunctive relief necessary to return him to the position that he would have been in but for Defendant's unlawful discrimination.

## VII.  RETALIATION IN VIOLATION OF THE FMLA
## AGAINST MR. HALL

157.  Plaintiff re-alleges and incorporates the allegations contained in the above paragraphs as if fully stated herein.

158.  Defendant's actions constitute unlawful retaliation on the basis of Andrew's protected activity of applying for and taking FMLA leave, in violation of the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq.*

159.    The employment practices complained of above were intentional.

160.    Defendant subjected Andrews to adverse employment actions because of his engagement in protected activities, including terminating his employment.

161.    To redress the injuries sustained by Andrews on account of Defendant's discriminatory actions, he has retained the undersigned counsel to represent him in this action. He therefore seeks recovery of reasonable attorneys' fees, experts' fees, and costs.

162.    Additionally, Andrews seeks any and all equitable and injunctive relief necessary to return him to the position that he would have been in but for Defendant's unlawful discrimination.

## VIII.   JURY DEMAND

163.    Plaintiff hereby makes a demand for a trial by jury on all issues, claims, and defenses in this action.

## IX.   PRAYER

164.    WHEREFORE, Plaintiff Joshua Andrews respectfully requests that the above-named Defendants be cited to appear in this matter and that, after jury trial by proof, he be awarded:

### A.  Damages as to Defendant MCHD:

    a.  Reinstatement of employment with MCHD;

    b.  Injunctive relief against Defendant, ordering Defendant, their officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, no longer engage in disability discrimination in its employment practices;

c. Injunctive relief ordering Defendants, their officers, agents, successors, employees, representatives, and any and all persons acting in concert with them to develop policies and procedures for preventing the recurrence of any such discriminatory and unlawful acts, including but not limited to the following:

d. An order that Defendant, their officers, agents, successors, employees, representatives, and any and all persons acting in concert with them institute and carry out policies, practices, and programs that provide equal employment opportunities for all persons with disabilities, and that it eradicate the effects of its past and present unlawful employment practices;

e. Declaratory judgment that MCHD's practices complained of herein are unlawful and violate the Americans with Disabilities Act Amendments Act;

f. Attorneys' fees and costs of this action; and

g. Such other and further legal and/or equitable relief to which Plaintiff may be justly entitled, as this Court may deem proper.

B. **Damages as to Defendant Spencer Hall:**

a. Declaratory judgment that practices complained of herein are unlawful and violate the Family and Medical Leave Act.

b. Enjoin Defendant from retaliating further against Plaintiff because of his protected conduct; by removing Plaintiff from any no-rehire lists or expressing to others that he was terminated from his position.

c. Award Plaintiff judgment against Defendant for:

    i. Actual damages, including lost wages and benefits (both front and back pay);

    ii. Compensatory damages;

    iii. Liquidated damages;

    iv. Punitive and/or exemplary damages;

    v. Prejudgment and post-judgment interest;

    vi. Attorneys' fees and costs of this action; and

d. Such other and further legal and/or equitable relief to which Plaintiff may be justly entitled, as this Court may deem proper.

Respectfully submitted,
Wiley Wheeler, P.C.

By: _____

Kalandra N. Wheeler
Texas Bar No. 24051512
*Board Certified Specialist, Texas Board of Legal Specialization, Labor and Employment Law*

WILEY WHEELER, P.C.
1651 Richmond Avenue
Houston, Texas 77006
Telephone: (713) 337-1333
Facsimile: (713) 337-1334
kwheeler@wiley-wheeler.com
ATTORNEYS FOR PLAINTFF